# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

<table>
<tr><td>

In re the Dependency of:

G.B. (DOB: 12-23-08); and
A.B. (DOB: 5-5-11),

              Minor Children.

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

              Respondent,

              v.

KEVIN BANKS,

              Appellant.

</td><td>

No. 72164-0-I
(consolidated with No. 72165-8-I)

DIVISION ONE

UNPUBLISHED

FILED: <u>April 27, 2015</u>

</td></tr>
</table>

Cox, J. — Kevin Banks appeals a juvenile court order finding his daughters, G.B. and A.B., dependent. Based on certain remarks made by the court and the court's active participation in the dependency proceedings, Banks contends that the juvenile court judge exhibited bias and lack of impartiality, depriving him of a fair hearing. Because this record is devoid of evidence supporting these claims, the findings of fact are either unchallenged verities on appeal or are supported by substantial evidence, and the findings support the conclusions of law, we affirm.

Kevin Banks and Leah Banks are the parents of two girls, A.B., born in 2011 and G.B., born in 2008. Leah is also the mother of A.U., a daughter born in 2005.[1]

On the evening of December 29, 2013, A.U. ran to a neighbor's home in a frantic state seeking help because her father was choking her mother. A.U. demonstrated the choking. The neighbor called 911. An officer responded and noted visible injuries, but Leah refused medical attention, denied that Kevin caused the injuries, and claimed she caused the marks on her neck herself. By the time the police officer responded, Kevin had already fled the scene.

Following this incident, a social worker employed by Child Protective Services (CPS) investigated. She attempted to speak to Kevin and Leah, but both refused. The social worker reviewed the parents' criminal history, CPS files, and various police reports. She also spoke to A.U. at school, to the neighbor who called 911, and to some maternal relatives. Based on this investigation, she filed a dependency petition on behalf of the Department of Social and Health Services (the Department).

At the 72-hour shelter care hearing, Police arrested Leah on an outstanding warrant. The court found there was a basis for shelter care, but determined that the children could remain in the home with Leah upon her release from jail with services in place. Accordingly, the court ordered placement with the mother upon various conditions, including the condition that the father move out of the family home and have no contact with the family, apart from

_____

[1] Because the parents share the same last name, we refer to them by their first names for clarity.

2

supervised visitation. The court ordered that violation of the conditions would result in removal of the children and placement in licensed care.

In March 2014, after speaking with the two older children at school, the appointed guardian ad litem (GAL) reported that the father was present in the home in violation of the shelter care order and that another possible domestic violence incident had occurred wherein Kevin threatened to kill Leah with a knife in front of the children. The social worker went to the home following these disclosures and found Kevin there. When the social worker returned to the home a second time, Leah and the children were gone, and Kevin claimed not to know where they were.

Leah and the children did not return home and the two older children did not attend school for the next few days. Leah then left the three children in the care of her sister. The Department eventually moved the children to foster care placement in May 2014, a few weeks before the dependency hearing.

Kevin and Leah contested the dependencies. The juvenile court held a dependency fact-finding hearing over the course of 10 days in May 2014. The court considered the testimony of more than 20 witnesses, including the parents, social workers, police officers, the neighbor, the mother of two of Kevin's older children, and the GAL.

The testimony established that Kevin and Leah began dating in 2008 and married in 2011. Both denied the existence of any domestic violence in the relationship. Leah previously admitted, however, that domestic violence occurred earlier in the relationship. Both parents acknowledged that police had

responded to disturbance calls at the family home on numerous occasions. Kevin estimated that the police had been to the home approximately 8 to 10 times.

Kevin had a significant criminal history involving domestic violence that included five convictions for domestic violence assault against five different women between 1996 and 2007 and a prior domestic violence felony conviction for violating a no-contact order. At least two women had obtained protection orders against Kevin. At the time of the dependency hearing, a protection order prohibited Kevin's contact with two of his older children from a prior relationship. Kevin could not remember participating in domestic violence treatment in the past.

Kevin testified about a 2007 medical incident that was "like a stroke." He said that after surgery, he remained in a coma for six weeks. Kevin testified that this medical event left him disabled and resulted in significant memory loss. He presented no evidence, apart from his testimony, to substantiate the nature and extent of his medical issues. Kevin testified that he could not remember any significant conduct that resulted in prior arrests and convictions.

A Pierce County court declared Leah's oldest daughter, A.U., dependent in 2007 due to Leah's substance abuse and neglect. The Department placed A.U. in the care of a relative for two years, but eventually returned her to Leah's care after she completed inpatient and outpatient drug treatment. After a termination trial, the dependency was dismissed in 2010.

4

Police officers described encounters with the Bankses following disturbance calls between 2010 and 2013. On one occasion in 2010, Leah provided a written statement to the police. She described Kevin as "aggressive and violent," said Kevin called her a "stupid dumb ass bitch" and threw a remote control at her. Leah also said Kevin refused to let her leave the house and she feared for her life. There were times when Leah had observable injuries or when she initially said Kevin used violence against her, but then recanted. An August 2013 incident also involved A.U. appearing at the neighbor's door after midnight crying and reporting that her mother was on the floor bleeding and needed help. The officer who responded to the August 2013 911 call observed injures to Leah's head and hand. Police arrested Kevin only on that single occasion, but he was not charged. There was also evidence of the presence of alcohol and a marijuana grow operation in the home that was accessible to the children and evidence of the parents' access to weapons.

At the conclusion of the fact-finding hearing, the trial court found G.B. and A.B. dependent as to Kevin as defined in RCW 13.13.030(b) and (c) because of his "repeated commission of domestic violence against the mother in the presence of the children" and because of his status as an "untreated domestic violence perpetrator." The court also found all three children dependent as to Leah under RCW 13.34.030(c) but stated that this finding was "time specific" because "no one has made it safe for the mother to raise the children." The court ordered placement of the children with Leah and entered an order prohibiting Kevin from having contact with the family and from being present in or near the

family home. The court ordered Kevin to complete domestic violence treatment and ordered assessment and counselling for the three children. Kevin appeals.

## LACK OF IMPARTIALITY AND BIAS

Kevin claims the juvenile court judge lacked impartiality and was biased against him. Accordingly, he claims he was deprived of a fair hearing. We disagree.

> Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial and neutral hearing. "'The law goes farther than requiring an impartial judge; it also requires that the judge appear to be impartial.'" "Evidence of a judge's actual or potential bias must be shown before an appearance of fairness claim will succeed." Under the Code of Judicial Conduct, designed to provide guidance for judges, "'[j]udges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned.'"[2]

The primary purpose of a dependency hearing "is to allow courts to order remedial measures to preserve and mend family ties."[3] Unlike a parental termination proceeding, a dependency hearing is "'a preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights.'"[4] As the legislature has determined, in balancing the legal rights of parents against the rights of the child, the rights and safety of the child is the paramount concern.[5]

RCW 13.34.030(6) provides, in relevant part, that a dependent child is any child who:

---

[2] State v. Gamble, 168 Wn.2d 161, 187-88, 225 P.3d 973 (2010).

[3] In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005).

[4] In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992) (quoting In re Dependency of A.W., 53 Wn. App. 22, 30, 765 P.2d 307 (1988)).

[5] RCW 13.34.020; In re Dependency of Schermer, 161 Wn.2d 927, 942, 169 P.3d 452 (2007).

(b) Is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child; [or]

(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

We will affirm an order of dependency so long as substantial evidence supports the trial court's findings of fact and the findings support the conclusions of law.[6] Unchallenged findings are verities on appeal.[7]

In this appeal, Kevin does not challenge the court's determination that, by a preponderance of the evidence, the children meet at least one of the statutory definitions of dependency under RCW 13.34.030.[8] In particular, he does not challenge the evidence supporting the court's findings that he repeatedly committed acts of domestic violence against Leah in the presence of the children and that the children were traumatized as a result.

Kevin assigns error to only one portion of a single finding, Finding of Fact 35, which states: "[t]he court cannot say that the father is a good father because no domestic violence perpetrator can be a good parent or a good husband."[9] However, the Department presented evidence that domestic violence in the home threatens the physical safety of children and is a leading cause of child fatality. There was also evidence that exposure to domestic violence is traumatic

---

[6] In re Dependency of M.S.D., 144 Wn. App. 468, 478, 182 P.3d 978 (2008).

[7] In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

[8] See Key, 119 Wn.2d at 612.

[9] Clerk's Papers at 536.

and detrimental to the psychological and emotional welfare of children. Evidence in the record supports the finding.

More importantly, while adequately supported, the finding is superfluous in light of the unchallenged findings that Kevin was actively engaging in domestic violence, the violence in the Bankses' home was escalating, the children manifested symptoms of trauma, and Kevin failed to acknowledge the problem or complete domestic violence treatment in spite of his documented history of violence in numerous relationships.

Instead of challenging these essential findings supporting the order of dependency, Kevin claims that the court erred in denying his motion for a mistrial based upon the court's display of personal bias against him. Because the remarks that prompted Kevin's motion were not indicative of impartiality or bias, we disagree.

Kevin testified non-continuously over the course of four days. One of the first issues the attorney representing the Department asked Kevin about was his criminal history involving domestic violence. With respect to all of his convictions and the events leading up to those convictions, the only details Kevin could recall were about being in jail, throwing water from a cup at someone, and the fact that one of the alleged victims grabbed him in the crotch area. He could remember relationships with some of the victims, but claimed not to remember other victims at all. He said that all he recall about prior domestic violence was "waking up out of a coma." Nevertheless, Kevin eventually said he regretted and wanted to take

"responsibility" for his criminal history, despite not being able to remember committing any acts of violence.

Kevin also testified about various times when police responded to the family home. For instance, he said that in December 2013, he and Leah fought about cigarettes and he called 911 because Leah was very upset. He said that in August 2013, Leah became upset and destructive and eventually hurt herself because they had recently moved and he talked to another woman about helping Leah with the house. He claimed that another time, he called the police because Leah took his work vehicle.

During a discussion about his violation of the order imposed following the shelter care hearing, Kevin said he remembered the hearing, but said he was not provided with a copy of the court order and did not remember that the court imposed a contact restriction. After the shelter care order failed to refresh his memory, the court replayed the audio recording of the January 2014 hearing in which the commissioner imposed the order in clear terms. After hearing the recording, Kevin insisted he did not fully comprehend the specifics of the restriction.

At several points, the court expressed frustration with Kevin regarding his inconsistent and apparently selective memory. The judge remarked that Kevin was "testing her patience" and had been "untruthful, unresponsive, inconsistent, and evasive in response to counsel's questions." The court stated:

> He doesn't take responsibility for any of this. He won't
> acknowledge a single act of domestic violence ever. He can't
> explain why the police have been called to the home, he can't
> explain why people have called the police, he can't explain why his

children would report domestic violence. He claims to be sorry about things he says he doesn't—never did.[10]

The court's frustration reached its peak during a discussion on the third day of Kevin's testimony about whether he believed his parenting was deficient in any manner and whether he wanted to avail himself of any services the Department could provide. After Leah's attorney objected to the questions about services, claiming that Kevin had no basis to know about what services were available to him, the court stated:

> You know, Mr. Banks is not the fool that he sometimes likes to portray himself as being. He reads just fine, he remembers things when people testify contrary to what he said, okay? He hears this Court when I tell him something bad will happen to him if he doesn't follow through on the Court's orders. He's a lot brighter than he likes to let on. We have talked about services up the yin yang this week, and he's been at the hearings where services have been discussed. He's discussed with his attorney which services he would and wouldn't accept. We actually heard his attorney telling the Court what he would agree to and on what conditions, okay?
>
> The argument that he doesn't know what we're talking about in terms of services here [strains] credulity as most of what Mr. Banks has been doing here does for me. My credulity got strained real early, and it's continued to be strained to the point where I really don't believe much of what Mr. Banks says, okay? If he wants to tell me that he'd welcome any and all services but that he can't name any, then we'll live with that. If he wants to name a particular service that he wants, he can tell us.[11]

Kevin's attorney moved for a mistrial, based on the court's "statements regarding my client." The court denied the motion, and clarified that the court was making a credibility finding that, up to that point, Kevin's testimony was nonsensical and incredible.

---

[10] Report of Proceedings (May 21, 2014) at 714.
[11] Id. at 718.

Several days later after Kevin's testimony was complete, in reference to his testimony about his medical condition, the court reiterated its determination regarding Kevin's credibility:

> I have said it loud enough that [Kevin's attorney] asked me for a mistrial. I don't believe the father. I don't believe anything he tells me unless it's supported by written evidence. He was incredible throughout his testimony.[12]

Kevin did not articulate any specific legal theory below, but on appeal, he relies on theories of due process, the appearance of fairness doctrine, and the Code of Judicial Conduct. Kevin's argument under all of these theories is that the dependency hearing was fundamentally unfair because the judge was motivated by actual or potential bias against him. As evidence of this bias, Kevin points to the court's admitted expertise in the area of domestic violence, its active participation during the proceedings, and its direct comments during his testimony, including the comment that prompted his counsel to move for a mistrial.

While some of the court's remarks would have been prejudicial to him had they been made before a jury, that was not the case in this proceeding. The judge was the finder of fact, not a jury.

Moreover, we cannot say that a "reasonably prudent, disinterested observer," seeing the full context of this hearing, would have concluded that the judge failed to give Kevin "a fair, impartial, and neutral hearing," as the law requires. The isolated remarks were unflattering to him. And they certainly demonstrate the court's loss of patience with him. But our review of the record,

_____

12 Report of Proceedings (May 27, 2014) at 986.

which includes almost 2,000 pages of transcript, leads us to conclude that the court's comments were not reflective of either actual or potential bias.

While Kevin did not specifically request recusal or move for disqualification, due process, the appearance of fairness, and the Code of Judicial Conduct all require disqualification of a judge who is biased against a party or whose impartiality may be reasonably questioned.[13] Specifically, the appearance of fairness doctrine requires that judges not only actually be unbiased, but that they also appear to be unbiased.[14] And the Code of Judicial Conduct requires a judge to uphold the independence of the judiciary and to recuse herself or himself where there is bias against a party.[15]

"For a judge to be biased or prejudiced against a person's cause is to have a preconceived adverse opinion with reference to it, without just grounds or before sufficient knowledge. It is a particular person's state of mind that affects his opinion or judgment."[16] The trial court is presumed to perform its functions without bias or prejudice.[17] A party alleging judicial bias must present evidence of actual or potential bias.[18] We use an objective test to determine whether a

---

[13] Wolfkill Feed & Fertilizer Corp. v. Martin, 103 Wn. App. 836, 841, 14 P.3d 877 (2000).

[14] Gamble, 168 Wn.2d at 187 (quoting State v. Madry, 8 Wn. App. 61, 70, 504 P.2d 1156 (1972)).

[15] CJC Canon 1; CJC Canon 3(D)(1).

[16] In re Borchert, 57 Wn.2d 719, 722, 359 P.2d 789 (1961).

[17] Wolfkill Feed & Fertilizer, 103 Wn. App. at 841.

[18] State v. Post, 118 Wn.2d 596, 618, 619 n.9, 826 P.2d 172, 837 P.2d 599 (1992).

judge's impartiality might reasonably be questioned by a reasonable person who knows all the relevant facts.[19]

It is clear that during the course of Kevin's testimony, the judge became convinced that Kevin was feigning loss of memory about things he would rather not admit to, avoiding answering direct questions, and generally refusing to admit any wrongdoing. In expressing her assessment of Kevin's testimony, the judge was neither signaling her own bias nor gratuitously expressing a general personal opinion about Kevin. Rather, after hearing extensive testimony, the court detailed some of the reasons why Kevin's testimony was problematic and made findings about credibility that supported the court's ultimate decision regarding the dependent status of the children.

There is no evidence in the record to suggest that the juvenile court judge had any preconceived bias against Kevin at the outset of the case. None of the trial court's comments or rulings indicate that the court was unwilling to consider Kevin's position merely because of the allegations of domestic violence. Nor do any of the court's comments suggest that dependency was a foregone conclusion because of the allegations and criminal history. The court expressly observed that, in fact, past commission of acts of domestic violence does not necessitate a finding of parental fitness. The court noted in its oral ruling that it was Kevin's failure to acknowledge and confront the issue of violence that was most troubling. The court expressed confidence that it is possible for parents who once engaged in domestic violence to become "quite fit parents" once they

---

[19] In re Marriage of Davison, 112 Wn. App. 251, 257, 48 P.3d 358 (2002) (quoting Sherman v. State, 128 Wn.2d 164, 206, 905 P.2d 355 (1995)).

13

face the problem and commit themselves to treatment. The court also emphasized the nonpunative purpose of the dependency and dispositional order:

> Mr. Banks, I'm going to lift this order if and when you get yourself through domestic violence treatment, okay? I absolutely am not intending to separate you from your family. I'm intending to get you through services so you're safe with your family."[20]

In sum, the court was entitled to make credibility findings based on its observations and the record does not reveal any instance suggesting that the juvenile court judge developed a personal dislike for Kevin that resulted in bias, or the appearance of unfairness, or deprived Kevin of due process.

The record also does not support the claim that by actively participating in the hearing, the court took on the role of an advocate for the Department. The judge questioned virtually all of the witnesses to varying extents, without aligning herself with counsel for any of the parties. And the court's critiques and expressions of skepticism were not limited to Kevin's testimony. The court pressed many witnesses on various points, including witnesses presented by the Department. The court also disagreed with some of the positions taken by the attorney representing the Department.

Kevin also claims he was unfairly prejudiced because of the court's expertise in the area of domestic violence. However, Kevin ignores the context in which this issue arose. The judge's experience and independent views about domestic violence primarily came into play when the court perceived that the Department was advocating dependency with respect to Leah based on her status as a domestic violence victim. As reflected in the order of dependency,

---

[20] Report of Proceedings (June 6, 2014) at 1759.

the court strongly disagreed with the position that Leah was unable to adequately care for her children merely because she had been subjected to domestic violence. The court's views also appeared to factor into the dispositional decision placing the children with Leah. In light of this context, Kevin fails to explain how he was affected, much less prejudiced, by the court's expertise. In any event, a judicial officer's expertise in a substantive area of law, by itself, does not establish actual or potential bias. For example, Judge Jack B. Weinstein is the author of a well-known treatise on evidence. But that did not disqualify him from his long and distinguished judicial service as a trial judge in the United States District Court for the Eastern District of New York. Kevin cites no authority to support this novel claim, and we assume there is none.

Because the relevant findings supporting the dependency are unchallenged, the findings support the conclusions, and the court's statements and other actions that Kevin challenges on appeal do not constitute error, we affirm the order of dependency.

_Cox, J._

WE CONCUR:

_Leach, J._   _Appelwick, J._